**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

STRAIGHT LINE, L.L.C. et al.,

                Appellants,           3:18-cv-601
                                                         (GLS)

      v.

**ADAM M. MADIGAN,**

                Appellee.
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE APPELLANTS:**<br>Selbach Law Offices, P.C.<br>8809 Daylight Drive<br>Liverpool, NY 13090 | JAMES F. SELBACH, ESQ. |
| **FOR THE APPELLEE:**<br>Orville & McDonald Law, P.C.<br>30 Riverside Drive<br>Binghamton, NY 13905 | PETER A. ORVILLE, ESQ. |

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Appellants Straight Line, L.L.C., Jeffrey E. Barber, Jean B. Barber, Emily J. Barber, Paul T. Barber, and Bethany A. Barber appeal from a Memorandum-Decision and Order of Bankruptcy Court (Cangilos-Ruiz, J.),

(Dkt. No. 2 at 11-42) (hereinafter "Bankr. MDO"[1]), which, among other things, dismissed appellants' 11 U.S.C. § 523(a)(2)(A) claim against appellee Adam M. Madigan after a bench trial, (Bankr. MDO at 2, 28, 32). For the reasons that follow, Bankruptcy Court's corresponding May 8, 2018 Judgment, (Dkt. No. 2 at 43), is vacated, and the case is remanded.

## II. <u>Background</u>

Straight Line is a business that provides financing to dealers who buy vehicles at auctions run by State Line Auto Auction, Inc., a related business also owned by appellants. (Bankr. MDO at 3 & nn. 4-5.)[2] In October 2008, Jeffrey Barber, manager and president of State Line, hired Madigan; after eight months of training under the outgoing credit manager, Madigan became the credit manager. (*Id.* at 3 n.4, 4.)[3]

Madigan allowed Joseph and Chauncy Strevell (hereinafter "the Strevells"), third parties who had been doing business with Straight Line for

---

[1] Citations to Bankruptcy Court's Memorandum-Decision and Order refer to its internal page numbers. All other citations to Dkt. No. 2 refer to the CM/ECF-generated page number(s).

[2] The court assumes the parties' familiarity with the underlying facts.

[3] Technically, Madigan was hired to work at State Line, but State Line employees also run Straight Line, which has no employees. (Bankr. MDO at 4 & n.7.)

2

a month and had not yet made any payments, to substantially exceed their $200,000 credit limit. (*Id.* at 6, 7.) When the Strevells began to finance cars on behalf of RJC Trading with Straight Line, Madigan never established a credit line, performed a credit check on RJC, or required the Strevells to sign a financing agreement. (*Id.* at 7-8.) Moreover, Madigan routinely released vehicle titles to the Strevells before they paid, (*id.* at 8), which was something Straight Line only did in limited circumstances inapplicable here, (*id.* at 5-6).

During the time the Strevells had an active business relationship with Straight Line, Madigan did not disclose to appellants that the Strevells were in excess of their credit limit and lacked a financing agreement for RJC. (*Id.* at 8.) Madigan also did not disclose that he was releasing titles to the Strevells before payment; he did so for seventy-eight vehicles that were converted by the Strevells during the relevant time period. (*Id.* at 8, 11.)

Despite Barber asking Madigan numerous times about the Strevells, Madigan failed to disclose any of this information. (*Id.* at 8-9, 20.) Specifically, when Barber asked numerous times if the Strevells were "okay," Madigan "regularly responded that '[t]hey pay like clockwork.'" (*Id.*

3

at 8.)  Madigan also reported to appellants at weekly management meetings but never filled them in on the Strevells.  (*Id.* at 8.)

Appellants terminated all business with the Strevells when they learned from an auction owner that they appeared to be legal risks.  (*Id.* at 9.)  Thereafter, Madigan engaged in a cover-up; he falsified business records and lied to Barber and the police about how much the Strevells owed Straight Line.  (*Id.* at 10.)  Madigan eventually pleaded guilty to nineteen misdemeanor counts of falsifying business records under § 175.05 of the New York Penal Code.  (*Id.*)

## III.  <u>Standard of Review</u>

District courts have jurisdiction to hear both interlocutory and final appeals from bankruptcy court orders and judgments.  *See* 28 U.S.C. § 158(a).  In exercising its appellate jurisdiction, the district court reviews findings of fact for clear error and conclusions of law *de novo*.  *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012).  Causation is a finding of fact that is subject to clear error review.  *See Maricultura del Norte v. Umami Sustainable Seafood, Inc.*, 769 F. App'x 44, 50 (2d Cir. 2019); *CARCO GRP., Inc. v. Maconachy*, 718 F.3d 72, 79 (2d Cir. 2013) (citing *Cont'l Ins. Co. v. Lone Eagle Shipping Ltd.*, 134 F.3d 103, 104 (2d

4

Cir. 1998) (per curiam)). "Clear error exists when although there is evidence to support a finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Glossip v. Gross*, 135 S. Ct. 2726, 2786 (2015) (internal quotation marks and citation omitted). "On an appeal, a district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *Kohout v. Nationstar Mortg., LLC*, 576 B.R. 290, 295 (N.D.N.Y. 2017) (internal quotation marks, footnote, and citations omitted).

## IV. Discussion

The sole issue on appeal concerns appellants' $1.5 million fraud claim against Madigan pursuant to § 523(a)(2)(A), (Dkt. No. 7 at 6 (citing Bankr. MDO at 17)), which Bankruptcy Court dismissed, (Bankr. MDO at 28, 32), for a lack of causation, (*id.* at 26, 28). The fraudulent misrepresentations[4] at issue are Madigan's failures to fully respond to

---

[4] Bankruptcy Court refers to Madigan's fraudulent misrepresentatio*n*, singular. (*See, e.g.*, Bankr. MDO at 24, 26, 27.) However, Bankruptcy Court found that Madigan answered multiple inquires by Barber about the Strevells. (*Id.* at 8 ("Barber . . . approached [Madigan] numerous times . . . and asked him [about the Strevells] . . . to which [Madigan] regularly responded that '[t]hey pay like clockwork.'"); 20 ("The record

Barber's inquiries regarding the Strevells, (*Id.* at 21; Dkt. No. 7 at 8, 9-10),[5] which do not include his subsequent cover-up.[6]

Bankruptcy Court analyzed the five elements of a § 523(a)(2)(A) fraud claim: 1) material false representation, 2) scienter, 3) intent to defraud, 4) justifiable reliance, and 5) causation. (Bankr. MDO at 18-19 (internal citations omitted).) Bankruptcy Court held that appellants established the first four elements. (*Id.* at 22-23.)[7] However, it also held that appellants failed to establish the final element, causation. (*Id.* at 26,

---

reflects that Jeffrey Barber inquired of [Madigan] concerning the Strevells on numerous occasions[.]").) Thus, the court refers to Madigan's fraudulent misrepresentation*s*, plural.

[5] Bankruptcy Court correctly noted that "under well-established principles . . . , a wholly truthful statement can qualify as a fraudulent misrepresentation if 'the maker knows or believes [the statement] to be materially misleading because of his failure to state additional or qualifying matter[s].'" (Bankr. MDO at 21 (quoting Restatement (Second) of Torts § 529).)

[6] Appellants brought a second claim under § 523(a)(2)(A) regarding Madigan's cover-up. (Bankr. MDO at 19-20; 28-29.) Bankruptcy Court dismissed this second § 523(a)(2)(A) claim. (Bankr. MDO at 29, 32.) Appellants did not appeal that dismissal or Bankruptcy Court's finding that there was no evidence that Madigan was acting in concert with the Strevells. (*Id.* at 20; Dkt. No. 7.)

[7] Bankruptcy Court correctly noted that the burden here is preponderance of the evidence. (Bankr. MDO at 18 (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).)

6

28; Dkt. No. 7 at 6.)  Causation is comprised of causation in fact and legal causation, (Bankr. MDO at 18-19, 24-25, 27 (internal citations omitted)), and Bankruptcy Court held that appellants failed to establish either, (*id.* at 26, 28), which is the subject of this appeal.

1. *Causation in Fact*

Causation in fact requires appellants' reliance to be "a substantial factor in determining the course of conduct that results in [their] loss." Restatement (Second) of Torts § 546 (Restatement).[8]  Bankruptcy Court recognized as much but held appellants to a stricter "but-for" standard. (Bankr. MDO at 24-25.)  The Restatement explicitly rejects a but-for standard in this context:

> For a misrepresentation to be a cause in fact of the pecuniary loss that results from the plaintiff's action or inaction, the plaintiff must have relied upon the misrepresentation in incurring the loss. *It is not, however, necessary that his reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct.  It is not even necessary that he would not have acted or refrained from acting as he did unless he had relied on the misrepresentation*.  It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision. Thus it is immaterial that he is influenced by other considerations, such

---

[8] As Bankruptcy Court correctly noted, the Supreme Court has looked to the Restatement when faced with a § 523(a)(2)(A) claim. (Bankr. MDO at 23-24 (citing *Field v. Mans*, 516 U.S. 59, 70 (1995)).)

7

as similar misrepresentations from third persons, if he is also substantially influenced by the misrepresentation in question.

Restatement § 546 cmt. b (emphasis added) (internal citation omitted).

Specifically, Bankruptcy Court concluded that "[t]he record is devoid . . . of any evidence to support a finding of a point in time at which any remedial actions taken by [appellant]s would have prevented or even mitigated their loss." (Bankr. MDO at 25.) "Without those facts in evidence, . . . [Bankruptcy] [C]ourt cannot find that [Madigan] deprived [appellant]s of a valuable remedial action, or, said another way, that [appellant]s' course of conduct (inaction) resulted in their loss." (*Id.*)

This court is mindful that "[a]ssessments of the credibility of the witnesses and the weight to be given to particular pieces of evidence are peculiarly within the province of the trier of fact and are entitled to considerable deference." *Cont'l Ins. Co.*, 134 F.3d at 104 (internal citation omitted). However, as argued by appellants, (Dkt. No. 7 at 10-12), it was clearly erroneous for Bankruptcy Court to find that there was no evidence that remedial actions by appellants would have mitigated their loss. Jeffrey Barber testified that had Madigan made him aware of the full truth, he would have curtailed lending to the Strevells—he "would have shut them

8

off," (Dkt. No. 3, Attach. 11 at 78)—and would have repossessed vehicles, (Bankr. MDO at 25). Barber also testified that appellants are able to repossess vehicles on their own and could have done so in this instance. (Dkt. No. 3, Attach. 11 at 78-79.)[9]

Importantly, this testimony was unrebutted; there is no reference to any contrary testimony or evidence. (Dkt. No. 7 at 13); *cf. First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 629 F. Supp. 427, 437 (S.D.N.Y. 1986) (rejecting defendant's causation argument because "plaintiffs' suggestion that they would have removed their securities from [third party]'s control had they learned of the fraud [earlier] . . . should control" and "had plaintiffs learned of the fraud at any time prior . . . they would have at least refrained from depositing additional securities"). The conclusion that "whether remedial actions taken at any given point in time would have had any value and succeeded to any extent to stem the loss" was "[m]issing," (Bankr. MDO at 25), thus goes against Barber's unrebutted testimony.

---

[9] This testimony refutes Bankruptcy Court's conclusion that it "cannot speculate that at a particular point in time [during the relevant time period], [appellant]s would have acted to do something that would have prevented their loss." (Bankr. MDO at 25.)

9

Moreover, at trial, Madigan admitted his role in causing appellants' damages:

> At trial [Madigan] was asked . . . "And [appellants] were damaged by your deception; were they not?["] [Madigan] answered[,] "Yes." [Appellant]s' counsel [also] asked[,] "And they were damaged in the sum of $1.5 million?["] [Madigan] answered, "Sounds about right." [Appellant]s' counsel went on to ask [Madigan,] "You deceived [Jeffrey Barber]. You committed fraud; didn't you?["] [Madigan] answered[,] "If that's your definition of fraud, then yes."

(*Id.* at 23 n.15 (internal citations omitted).) Bankruptcy Court "consider[ed] [Madigan]'s statements for what they [we]re worth, but d[id] not find them to be beyond rebuttable proof of causation of [appellant]s' damages." (*Id.* at 23 (internal footnote omitted).) However, there is no mention of how this testimony was ever rebutted.

Bankruptcy Court also posited "alternative scenarios" that "could have unfolded," and offered, as examples, what might have happened in 2013 or February 2014. (*Id.* at 25.) However, Bankruptcy Court determined the relevant time period during which appellants suffered their loss to be from March 28 to May 23, 2014. (*Id.* at 11, 21.) The court agrees with appellants that these alternative scenarios amount to speculation outside the relevant time period. (Dkt. No. 7 at 15.) Bankruptcy Court also noted that, after ending their business relationship

10

with the Strevells, appellants "made two fruitless attempts to limit their exposure" and "even when [appellant]s knew of the Strevells' duplicitous conduct and attempted to repossess vehicles for which they held titles, they still suffered a loss." (Bankr. MDO at 26.) But, as appellants argue, after the relationship with the Strevells ended, the loss had already occurred; the question is whether anything could have been done during the relevant time period, not afterward when it was too late. (Dkt. No. 7 at 15.)

Bankruptcy Court explained that it "d[id] not find that the self-serving statements by [appellant]s about their hypothetical conduct, made with the benefit of hindsight, are sufficient to meet their burden of proof." (Bankr. MDO at 26.) However, the fact that Barber's unrebutted testimony is self-serving is not, standing alone, a basis to disregard it. *See Genn v. New Haven Bd. of Educ.*, 219 F. Supp. 3d 296, 313 (D. Conn. 2016) ("The fact that testimony is self-serving does not render it useless to the [c]ourt. Were it otherwise, courts could rarely rely upon any evidence offered by either side in a litigated matter."); *cf. Shon v. Sayres Corp.*, No. 93 Civ. 7654, 1995 WL 244582, at *2 n.3 (S.D.N.Y. Apr. 26, 1995) ("The fact that

11

[evidence] is self-serving does not mean it is false."). Moreover, the court agrees with appellants that an analysis of causation in fact necessarily entails looking back with the benefit of hindsight. (Dkt. No. 7 at 16.) In a similar case cited by Bankruptcy Court, (Bankr. MDO at 23), the First Circuit analyzed causation in fact—using hindsight—and reasoned that "had [debtor] not lied to [plaintiff] about the building-permit status . . . [plaintiff] would have canceled the construction contract and gotten back all or most of [his] initial . . . payment." *In re Goguen*, 691 F.3d 62, 69 (1st Cir. 2012) (internal quotation marks omitted).

In sum, appellants established that their reliance on Madigan's fraudulent misrepresentations was a substantial factor in determining their inaction to curtail lending and repossess vehicles, which resulted in the loss, and Bankruptcy Court's contrary finding is clear error.

   *2.   Legal Causation*

Despite concluding that there was no causation in fact, Bankruptcy Court prudently continued its analysis by examining legal causation. (Bankr. MDO at 27.) Legal causation hinges on reasonable foreseeability. (*Id.* at 24, 27 (internal citations omitted)); *see* Restatement § 548A ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting

12

from action or inaction in reliance upon it *if, but only if, the loss might reasonably be expected to result from the reliance.*") (emphasis added).

Bankruptcy Court determined that Madigan "could not have reasonably foreseen that his misrepresentation . . . would open the door for nefarious actors such as the Strevells to steal $1.5 million from [appellants]." (Bankr. MDO at 27.) However, it also found that Madigan's conduct

> gave rise to a situation (i) where the Strevells were significantly beyond the credit limit set . . . , (ii) there was no credit limit set for RJC Trading nor any guaranty in place, (iii) titles were haphazardly loaned without adherence to company policy and proper tracking, (iv) deposits were not made[,] and (v) proper fees were not charged.

(*Id.* at 27-28). Even so, Bankruptcy Court reasoned that holding Madigan liable for $1.5 million is "disproportionate to his culpability, especially in light of the criminal acts of the Strevells." (*Id.* at 28.) It also posited an analogy: "[W]ere a bank employee to negligently leave a vault unlocked and lie to their employer about the error, that lie could not reasonably be considered the legal cause of the loss suffered when a third party robbed the vault through the unlocked door." (*Id.* at 28 n.17.)

For the following reasons, the court is left with the definite and firm

13

conviction that a mistake has been committed, and Bankruptcy Court's finding of no legal causation constitutes clear error. *See Glossip*, 135 S. Ct. at 2786.

First, the analogy is flawed because Madigan did not act negligently but—as Bankruptcy Court found—fraudulently. (Bankr. MDO at 21-23, 26.) Moreover, the analogy ignores that appellants' loss might reasonably be expected to result from their reliance on Madigan's fraudulent misrepresentations, which kept them from curtailing lending and repossessing vehicles. *See* Restatement § 548A; *cf. In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 580 (S.D.N.Y. 2007) ("It is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm."). In terms of the analogy, appellants could have acted to prevent their loss while the vault that Madigan left unlocked was being robbed by the Strevells, but Madigan's fraudulent misrepresentations kept them from doing so.

In a similar case cited by Bankruptcy Court, (Bankr. MDO at 23), the First Circuit determined that legal causation existed. *See Goguen*, 691 F.3d at 70-72. There, the debtor was a contractor whom the plaintiff hired

14

to build an addition; the plaintiff stressed the importance of pouring the concrete foundation before winter to prevent cracking. *See id.* at 64. "As [the debtor] strung [the plaintiff] along with lies about the permit application, [the debtor] could have reasonably foreseen that his deceit would delay the project, which would lead to his pouring concrete in cold weather, which in turn would lead to the foundation's cracking." *Id.* at 70. In other words, the debtor "foresaw that, without adequate precautions, pouring concrete in cold weather could lead to cracking," which is what ultimately happened. *Id.* at 71. The same reasoning applies here. Madigan's misrepresentations prevented appellants from knowing that they were vulnerable to being ripped off by the Strevells, and it was reasonably foreseeable that appellants would be unable to protect themselves once the Strevells started ripping them off.

Safeguards such as credit limits and a policy of requiring payment before releasing vehicle titles are meant to protect against the very harm that the Strevells inflicted, *i.e.*, stealing vehicle titles and failing to pay. (Bankr. MDO at 4-6 (describing credit limit and title policy); 11 (describing Strevells' conversion of seventy-eight vehicles); 13-14 (noting "*obvious* importance of Straight Line's retention of title documents pending receipt of

payment" (emphasis added)).) It is thus especially foreseeable that the loss would result from appellants' reliance on Madigan's repeated fraudulent mispresentations concerning the Strevells. *Cf. Charney v. Wilkov*, 734 F. App'x 6, 11 (2d Cir. 2018) (reasoning defendant's lack of knowledge that third parties would commit criminal acts irrelevant because "[t]he loss of [real estate] investments was a foreseeable outcome from her failure to do any due diligence or to monitor the properties"); *Oei v. Citibank, N.A.*, 957 F. Supp. 492, 509 (S.D.N.Y. 1997) (reasoning third party's fraud did not break chain of causation because it was "one of the evils [defendant] was supposed to guard against" and "the harm was foreseeable"); *Kush v. City of Buffalo*, 59 N.Y.2d 26, 33 (1983) ("When the intervening, intentional act of another is itself the foreseeable harm . . . , the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs.")

Bankruptcy Court also focused on "policy considerations that serve to place manageable limits upon the liability that flows from *negligent* conduct." (Bankr. MDO at 28 (internal quotation marks and citation omitted) (emphasis added).) But fraudulent misrepresentation is an intentional tort, *see Field* 516 U.S. at 70, and the same policy

16

considerations do not apply, *see Meyers v. Epstein*, 282 F. Supp. 2d 151, 154 (S.D.N.Y. 2003) ("[R]esponsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent or is not at fault.") (quoting Restatement § 435B cmt. a) (internal citations omitted). "For an intended injury, the law is astute to discover even very remote causation." *Associated Gen. Contractors of Calif, Inc. v. Calif State Council of Carpenters*, 459 U.S. 519, 548 n.3 (1983) (internal quotation marks and citation omitted); *see also Knepper v. Brown*, 345 Or. 320, 330 (2008) ("Courts have noted that, when an intentional tort is involved, the range of legal causation can be quite broad[.]") (internal citations omitted).

Bankruptcy Court considered $1.5 million to be "an amount disproportionate to [Madigan's] culpability" and "too out of proportion to [his] misrepresentation[s]." (Bankr. MDO at 28 & n.17.) But legal causation turns on reasonable foreseeability, not proportionality. *See* Restatement § 548A. Bankruptcy Court also determined that legal causation in this case "would overly burden employees for third-party misconduct, would allow employers to fraudulently pursue remuneration from employees rather than appropriate third-party bad actors, and there

17

would be no reasonable stopping point to the employee's liability." (Bankr. MDO at 28 n.17.)  But the reasonable stopping point to liability is the applicable standard—reasonable foreseeability.  And Madigan would not be burdened by the misconduct of third-party bad actors if he had not made fraudulent misrepresentations about those actors.

Finally, Bankruptcy Court reasoned that "holding employees personally liable for the conduct of third parties, even where they lie to their employers about their conduct, would wrongly absolve employers of their responsibility to supervise adequately their employees." (*Id.*)  But Bankruptcy Court found that Madigan trained for eight months under Straight Line's long-time credit manager and "was well aware that he was violating company policy" as to the Strevells. (*Id.* at 4, 21.)  Furthermore, "[i]t was [Madigan]'s job to be on top of the very issues he hid from [appellants,] and [appellant]s were justified in relying upon [him] to perform the core responsibilities attendant to the position." (*Id.* at 23.)  It is thus difficult to say that appellants failed to adequately supervise Madigan.

3. *Damages*

As explained above, appellants established causation in fact and legal causation.  However, what remains to be determined is how much of

18

their $1.5 million loss was caused by Madigan's fraudulent misrepresentations. Bankruptcy Court defined the relevant period as March 28 to May 23, 2014, during which the Strevells converted seventy-eight vehicles with a value of $1,500,580.00. (*Id.* at 11, 21.) But even appellants recognize that Madigan is not responsible for *all* of their $1.5 million loss. (Dkt. No. 7 at 12 ("Had [Barber] known the truth early in [the relevant] [p]eriod, *the majority* of the damages would have been prevented.") (emphasis added).)

After concluding on appeal that causation had been established for a § 523(a)(2)(A) claim, in *Goguen* the First Circuit remanded for a determination of how much of the loss at issue was attributable to the debtor's fraudulent misrepresentations. *See* 691 F.3d at 72 (deciding "[a]t least *some* portion of . . . damages is attributable to the [the debtor's fraudulent misrepresentations]" and remanding because "the bankruptcy judge made no findings on that score, which is not surprising given that [the plaintiff] simply offered a ballpark estimate . . . [and] provid[ed] no precise figures"). A remand here is necessary for the same reasons. *See id.*

19

Thus, Bankruptcy Court's May 8, 2018 Judgment, (Dkt. No. 2 at 43), is vacated, and the case is remanded to Bankruptcy Court for further proceedings consistent with this Memorandum-Decision and Order.

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Bankruptcy Court's May 8, 2018 Judgment (Dkt. No. 2 at 43) is **VACATED**; and it is further

**ORDERED** that the case is **REMANDED** to Bankruptcy Court for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED** that the clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

August 19, 2019
Albany, New York

*Gary L. Sharpe*
Gary L. Sharpe
U.S. District Judge